# Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files

It is the policy of the Executive Branch to decline to provide committees of Congress with access to or copies of law enforcement files, or materials in investigative files whose disclosure might adversely affect a pending enforcement action, overall enforcement policy, or the rights of individuals.

Congressional assurance of confidentiality cannot overcome concern over the integrity of law enforcement files, not only because of concern over potential public distribution of the documents by Congress, but because of the importance of preventing direct congressional influence on investigations in progress.

It is the constitutional responsibility of the Executive to determine whether and when materials in law enforcement files may be distributed publicly, and this responsibility cannot and will not be delegated to Congress.

The principle of executive privilege will not be invoked to shield documents which contain evidence of criminal or unethical conduct by agency officials, and the documents at issue here have been made available for inspection by congressional staff members to confirm their proper characterization in this regard.

November 30, 1982

THE CHAIRMAN OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS
COMMITTEE ON ENERGY AND COMMERCE
UNITED STATES HOUSE OF REPRESENTATIVES

DEAR MR. CHAIRMAN: This letter responds to your letter to me of November 8, 1982, in which you, on behalf of the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce of the House of Representatives, continue to seek to compel the production to your subcommittee of copies of sensitive open law enforcement investigative files (referred to herein for convenience simply as law enforcement files) of the Environmental Protection Agency (EPA). Demands for other EPA files, including similar law enforcement files, have also been made by the Subcommittee on Investigations and Oversight of the Public Works and Transportation Committee of the House of Representatives.

Since the issues raised by these demands and others like them are important ones to two separate and independent branches of our Nation's government, I shall reiterate at some length in this letter the longstanding position of the

31

Executive Branch with respect to such matters. I do so with the knowledge and concurrence of the President.

As the President announced in a memorandum to the heads of all executive departments and agencies on November 4, 1982, "[t]he policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch. . . . [E]xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary." Memorandum from the President to the Heads of Executive Departments and Agencies (Nov. 4, 1982), re: "Procedures Governing Responses to Congressional Requests for Information," at 1. Nevertheless, it has been the policy of the Executive Branch throughout this Nation's history generally to decline to provide committees of Congress with access to or copies of law enforcement files except in the most extraordinary circumstances. Attorney General Robert Jackson, subsequently a Justice of the Supreme Court, restated this position to Congress over 40 years ago:

> It is the position of [the] Department [of Justice], restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the laws be faithfully executed,' and that congressional or public access to them would not be in the public interest.

> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

40 Op. Att'y Gen. 45, 46 (1941).

This policy does not extend to all material contained in investigative files. Depending upon the nature of the specific files and the type of investigation involved, much of the information contained in such files may and is routinely shared with Congress in response to a proper request. Indeed, in response to your subcommittee's request, considerable quantities of documents and factual data have been provided to you. The EPA estimates that approximately 40,000 documents have been made available for your subcommittee and its staff to examine relative to the three hazardous waste sites in which you have expressed an interest. The only documents which have been withheld are those which are sensitive memoranda or notes by EPA attorneys and investigators reflecting enforcement strategy, legal analysis, lists of potential witnesses, settlement considerations, and similar materials the disclosure of which might adversely affect a pending enforcement action, overall enforcement policy, or the rights of individuals.

32

I continue to believe, as have my predecessors, that unrestricted dissemination of law enforcement files would prejudice the cause of effective law enforcement and, because the reasons for the policy of confidentiality are as sound and fundamental to the administration of justice today as they were 40 years ago, I see no reason to depart from the consistent position of previous Presidents and attorneys general. As articulated by former Deputy Assistant Attorney General Thomas E. Kauper over a decade ago,

> the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 19, 1969), re: "Proposed letter from Secretary of the Army Resor to Chairman Rivers re submission of open CID investigative files," at 2.

Other objections to the disclosure of law enforcement files include the potential damage to proper law enforcement which would be caused by the revelation of sensitive techniques, methods, or strategy; concern over the safety of confidential informants and the chilling effect on sources of information if the contents of files are widely disseminated; sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law; and well-founded fears that the perception of the integrity, impartiality, and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process. Our policy is premised in part on the fact that the Constitution vests in the President and his subordinates the responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. The courts have repeatedly held that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case. . . ." *United States* v. *Nixon*, 418 U.S. 683, 693 (1974).

The policy which I reiterate here was first expressed by President Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presidents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower. I am aware of no President who has departed from this policy regarding the general confidentiality of law enforcement files.

I also agree with Attorney General Jackson's view that promises of confidentiality by a congressional committee or subcommittee do not remove the basis for the policy of nondisclosure of law enforcement files. As Attorney General Jackson observed in writing to Congressman Carl Vinson, then Chairman of the House Committee on Naval Affairs, in 1941:

> I am not unmindful of your conditional suggestion that your counsel will keep this information "inviolate until such time as the

33

committee determines its disposition." I have no doubt that this pledge would be kept and that you would weigh every consideration before making any matter public. Unfortunately, however, a policy cannot be made anew because of personal confidence of the Attorney General in the integrity and good faith of a particular committee chairman. We cannot be put in the position of discriminating between committees or of attempting to judge between them, and their individual members, each of whom has access to information once placed in the hands of the committee.

40 Op. Att'y Gen. at 50.

Deputy Assistant Attorney General Kauper articulated additional considerations in explaining why congressional assurances of confidentiality could not overcome concern over the integrity of law enforcement files:

[S]uch assurances have not led to a relaxation of the general principle that open investigative files will not be supplied to Congress, for several reasons. First, to the extent the principle rests on the prevention of direct congressional influence upon investigations in progress, dissemination *to* the Congress, not by it, is the critical factor. Second, there is the always present concern, often factually justified, with "leaks." Third, members of Congress may comment or publicly draw conclusions from such documents, without in fact disclosing their contents.

Kauper Memorandum at 3.

It has never been the position of the Executive Branch that providing copies of law enforcement files to congressional committees necessarily will result in the documents' being made public. We are confident that your subcommittee and other congressional committees would guard such documents carefully. Nor do I mean to imply that any particular committee would necessarily "leak" documents improperly although, as you know, that phenomenon has occasionally occurred. Concern over potential public distribution of the documents is only a part of the basis for the Executive's position. At bottom, the President has a responsibility vested in him by the Constitution to protect the confidentiality of certain documents which he cannot delegate to the Legislative Branch.

With regard to the assurance of confidential treatment contained in your November 8, 1982, letter, I am sensitive to Rule XI, Clause 2, § 706c of the Rules of the House of Representatives, which provides that "[a]ll committee hearings, records, data, charts, and files . . . shall be the property of the House and *all Members of the House shall have access thereto. . . .*" In order to avoid the requirements of this rule regarding access to documents by all Members of the House, your November 8 letter offers to receive these documents in "executive session" pursuant to Rule XI, Clause 2, § 712. It is apparently on the basis of § 712 that your November 8 letter states that providing these materials to your subcommittee is not equivalent to making the documents "public." But, as is

evident from your accurate rendition of § 712, the only protection given such materials by that section and your understanding of it is that they shall not be made public, in your own words, "without the consent of the Subcommittee."

Notwithstanding the sincerity of your view that § 712 provides adequate protection to the Executive Branch, I am unable to accept and therefore must reject the concept that an assurance that documents would not be made public "without the consent of the Subcommittee" is sufficient to provide the Executive the protection to which he is constitutionally entitled. While a congressional committee may disagree with the President's judgment as regards the need to protect the confidentiality of any particular documents, neither a congressional committee nor the House (or Senate, as the case may be) has the right under the Constitution to receive such disputed documents from the Executive and sit in final judgment as to whether it is in the public interest for such documents to be made public.[1] To the extent that a congressional committee believes that a presidential determination not to disseminate documents may be improper, the house of Congress involved or some appropriate unit thereof may seek judicial review (*see Senate Select Committee* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974)), but it is not entitled to be put in a position unilaterally to make such a determination. The President's privilege is effectively and legally rendered a nullity once the decision as to whether "public" release would be in the public interest passes from his hands to a subcommittee of Congress. It is not up to a congressional subcommittee but to the courts ultimately "'to say what the law is' with respect to the claim of privilege presented in [any particular] case." *United States* v. *Nixon*, 418 U.S. at 705, quoting *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

I am unaware of a single judicial authority establishing the proposition which you have expounded that the power properly lies only with Congress to determine whether law enforcement files might be distributed publicly, and I am compelled to reject it categorically. The crucial point is not that your subcommittee, or any other subcommittee, might wisely decide not to make public sensitive information contained in law enforcement files. Rather, it is that the President has the constitutional responsibility to take care that the laws are faithfully executed; if the President believes that certain types of information in law enforcement files are sufficiently sensitive that they should be kept confidential, it is the President's constitutionally required obligation to make that determination.[2]

[1] Your November 8 letter points out that in my opinion of October 13, 1981, to the President, 43 Op Att'y Gen _____, 5 Op. O L C. 27 (1981), a passage from the Court's opinion in *United States* v. *Nixon*, 418 U.S 683 (1974), was quoted in which the word "public" as it appears in the Court's opinion was inadvertently omitted. *See* 5 Op. O L C at 29 That is correct, but the significance you have attributed to it is not. The omission of the word "public" was a technical error made in the transcription of the final typewritten version of the opinion. This error will be corrected by inclusion of the word "public" in the official printed version of that opinion. However, the omission of that word was not material to the fundamental points contained in the opinion The reasoning contained therein remains the same As the discussion in the text of this letter makes clear, I am unable to accept your argument that the provision of documents to Congress is not, for purposes of the President's executive privilege, functionally and legally equivalent to making the documents public, because the power to make the documents public shifts from the Executive to a unit of Congress Thus, for these purposes the result under *United States* v. *Nixon* would be identical even if the Court had itself not used the word "public" in the relevant passage

[2] It was these principles that were embodied in Assistant Attorney General McConnell's letters of October 18 and 25, 1982, to you Under these principles, your criticism of Mr McConnell's statements made in those letters must be rejected Mr McConnell's statements represent an institutional viewpoint that does not, and cannot, depend upon the personalities involved I regret that you chose to take his observations personally.

These principles will not be employed to shield documents which contain evidence of criminal or unethical conduct by agency officials from proper review. However, no claims have been advanced that this is the case with the files at issue here. As you know, your staff has examined many of the documents which lie at the heart of this dispute to confirm that they have been properly characterized. These arrangements were made in the hope that that process would aid in resolving this dispute. Furthermore, I understand that you have not accepted Assistant Attorney General McConnell's offer to have the documents at issue made available to the members of your subcommittee at the offices of your subcommittee for an inspection under conditions which would not have required the production of copies and which, in this one instance, would not have irreparably injured our concerns over the integrity of the law enforcement process. Your apparent rejection of that offer would appear to leave no room for further compromise of our differences on this matter.

In closing, I emphasize that we have carefully reexamined the consistent position of the Executive Branch on this subject and we must reaffirm our commitment to it. We believe that this policy is necessary to the President's responsible fulfillment of his constitutional obligations and is not in any way an intrusion on the constitutional duties of Congress. I hope you will appreciate the historical perspective from which these views are now communicated to you and that this assertion of a fundamental right by the Executive will not, as it should not, impair the ongoing and constructive relationship that our two respective branches must enjoy in order for each of us to fulfill our different but equally important responsibilities under our Constitution.

Sincerely,
WILLIAM FRENCH SMITH
